UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of

BEST PAYPHONES, INC.,

                            Debtor

Case No. 01-B-15472 (SMB)
Chapter 11

BEST PAYPHONES, INC.,

                    Debtor-Appellant,

        -against-

MANHATTAN TELECOMMUNICATIONS CORPORATION,

                    Claimant-Appellee.

Docket No. 07-Cv-

ISSUES ON APPEAL

## ISSUES ON APPEAL

The Appellant proposes in its appeal of the post-trial judgment to raise all issues decided adversely to its interests in the Bankruptcy Court's post-trial Memorandum as well as in the Orders denying its prior motions for summary judgment disallowing MetTel's claim for lost profits and all parts thereof and denying its requests for additional discovery, including without limitation the following specific issues.

1. Whether errors in statements of facts surrounding the technical details of the telephone services provided and necessary to be provided to the Debtor's Public Pay Telephones ("PPTs") affected the final judgment.

2. Whether the erroneous statement of fact that the Debtor "regularly" changed dial-tone service providers unfavorably affected the final judgment.

3. Whether adequate evidence supported the conclusion that the one-year term of the second contract between the Debtor and North American Telecommunications Corporation ("NATelCo") (the "NATelCo Agreement") did not begin until January 31, 2001.

4. Whether NATelCo or its assignee can extend the duration of the NATelCo Agreement beyond the expectation of the parties by its failure promptly to effectuate the Agreement at the beginning.

5. Whether the threat by Manhattan Telecommunications Corporation ("MetTel") to disconnect service to all the Debtor's PPTs if its claim for unpaid services under its own prior contract with the Debtor were not paid within ten days constitutes an extracontractual demand impermissible under the NATelCo Agreement that excused the Debtor from performing the condition precedent of notice and an opportunity to cure.

6. Whether MetTel's extracontractual condition precedent constitutes a mere breach of the NATelCo Agreement such that the 10-day cure period in said Agreement would be operative.

7. Whether there was adequate evidence that MetTel's bid for NATelCo's PPTs assets was based sufficient knowledge of expected revenue from 11,500 PPT lines over the remaining terms of its PPT service contracts and/or accounts receivable.

8. Whether the Asset Purchase Agreement ("APA") was executed on April 4, 2001 or had any effect on said date.

9. Whether approval of the APA by the Bankruptcy Court validated the purchase.

10. Whether the APA was validly approved absent adequate or required notice to NATelCo's payphone operator customers, including the Debtor.

11. Whether the Debtor received adequate notice of the proposed sale of the NATelCo Agreement to MetTel.

12. Whether the Debtor unqualifiedly did not object to the assignment of the NATelCo Agreement.

13. Whether the Debtor contended that the NATelCo Agreement could not be assigned without its consent.

14.Whether the Debtor acknowledged that all executory contracts should be freely assignable to enhance the benefits to the estate an[d] aid in the reorganization of debtors.

15. Whether the Bankruptcy Court overruled the Debtor's Objection to the

assignment of its NATelCo Agreement or ever had time to consider it at all.

16. Whether the Bankruptcy Court approved the assignment of the NATelCo Agreement "from the bench" on April 25, 2001.

17. Whether NATelCo's customers, including the Debtor, were obligated to accept the assignment of the NATelCo Agreement to MetTel when the APA was approved without adequate assurance that the assignee (MetTel) would perform in the future and not threaten disconnection based on extraneous bills sent out under other contracts that allegedly would come due and be enforceable under § 2.1.2(d) of its tariff.

18. Whether the purported authorization of the Bankruptcy Court that MetTel could begin immediately to provide service to former NATelCo customers, including the Debtor, was effectuated, and if so, when.

19. Whether the Debtor filed a notice of appeal from the "bench order" of April 25, 2001.

20. Whether the "formal order" of the Bankruptcy Court entered May 16, 2001 ("Sale Order") constituted an effectuation of the transfer of the NATelCo Agreement to MetTel.

21. Whether MetTel voluntarily committed itself to obtaining regulatory approvals, and what regulatory approvals were necessary to effectuate the APA.

22. Whether it was only the urging of NATelCo that caused MetTel to seek regulatory approvals for the APA.

23. Whether 47 C.F.R. §§ 64.1100 et seq. are solely concerned with "slamming".

24. Whether the phrase "subject to the terms and conditions of any applicable agreements" constitutes adequate notification to NATelCo's PPT customers that they were not free to migrate to another carrier so long as their service agreements with NATelCo as assigned to MetTel remained in effect.

25. Whether the exhibit introduced by MetTel at the trial purporting to be the

Petition that it filed with the FCC was a true and accurate copy of the Petition that was filed.

26. Whether the phrase "subject to the terms and conditions of any applicable agreements" renders the notice received by NATelCo's PPT customers inadequate to satisfy FCC regulations or the FCC Order of April 11, 2001.

27. Whether the phrase "subject to the terms and conditions of any applicable agreements" renders the notice received by NATelCo's PPT customers inadequate to apprise said customers that the terms, including the commitment period, of their own service contract with NATelCo was intended to take precedence over the statutory right of such customers to choose their carrier by themselves.

28. Whether the form of notice letters in the FCC Petition of Bell Atlantic cited by MetTel was a proper precedent for MetTel's FCC waiver petition inasmuch as the Bell Atlantic notice letter referred to "the terms and conditions of *your* plan" and the MetTel letter referred to "the terms and conditions of *any applicable* service agreement".

29. Whether the content of the notice letter actually sent by MetTel to NATelCo's customers was consciously phrased to conceal from the customers that they would be forbidden to choose any other carrier for the duration of their plans and would be sued for lost profits if they did elect to migrate.

30. Whether by refusing to do business with MetTel in May, 2001, the Debtor was breaching its agreement that could be assigned to "permitted" assignees, when the only assignees permitted under the contract were those designated by mutual consent.

31. Whether MetTel complied with all conditions that the FCC deemed would "adequately protect the rights of the NATelCo customers".

32. Whether the change in the tariff incorporated into the NATelCo Agreement after its was assigned to MetTel constituted a change in the terms and conditions of service contrary to the requirements of the notice letter approved as a necessary condition to the FCC waiver Order.

33. Whether the FCC waiver Order could be used to effectuate a result—the

interruption of service to a NATelCo customer—that it was the stated purpose of the Order to avoid—any interruption of service to any customer.

34. Whether the Debtor could be allowed to waive its right to choose its carrier if the right is statutory and its waiver would violate public policy.

35. Whether the notices MetTel sent to NATelCo's customers were the notices that were required by the FCC Order or differed from the notices approved by the FCC, and what such differences were.

36. Whether MetTel's second notification letter was sent on April 1, 2001, or on some other date, and what such other date was.

37. Whether there was sufficient evidence to conclude that either MetTel notification letter was actually sent at all in the absence of competent testimony by a person who actually saw the letter or placed it in or addressed the envelope, or of business records regarding office mailing procedures and preservation of such records.

38. Whether the copies of the notification letters were properly admitted at the trial in the absence of any competent testimony that they were actually letters that were sent out to the Debtor.

39. Whether a notification letter characterized as a "welcome" letter and inserted with a bill constitutes the type of notification required by the FCC Order.

40. Whether migrations that had already begun before NATelCo and MetTel filed their joint petition with the New York Public Service Commission ("PSC") had any legal effect or could support the rendering of a bill by MetTel.

41. Whether a notice letter or a welcome letter stating "you are free to make arrangements to change your service to another carrier", sent to a customer with whom the sender knew it had a long-term service contract and would sue for breach of the contract if the customer did migrate immediately, constitutes a culpable inducement of such breach so as to constitute a defense to any action for damages based on such breach.

42. Whether "a timely petition would have been approved as consistent with the

public interest" was a reason for the PSC grant of MetTel's petition prospectively only.

43. Whether the PSC approved NATelCo's proposed notices and whether the notices purportedly sent conformed to the proposed notices approved by the PSC.

44. Whether a "Notice of Disconnection" constitutes a repudiation of the NATelCo Agreement.

45. Whether MetTel's Notice of Disconnection included a unilateral extracontractual demand that amounted to an anticipatory repudiation of the NATelCo Agreement and excused the Debtor's obligation to provide the ten-day notice and opportunity to cure contained in the NATelCo Agreement.

46. Whether the Bankruptcy Court correctly opined that MetTel would have refrained from disconnecting service to the Debtor if the error of including the demand to pay the State court judgment in an unrelated case were pointed out to MetTel, especially in view of § 2.1.2(d) of the MetTel tariff, deemed incorporated into the NATelCo Agreement after it was assigned to MetTel and MetTel did not assume the NATelCo tariff for purposes of its newly-assigned customers, refusing to follow such cases as *HOward Opera House Assocs. v. Urban Outfitters, Inc.*, 2001 U.S. Dist. LEXIS 25198, at *9 (D. Vt. Nov. 29, 2001).

47. Whether the phrase "subject to the terms and conditions of any applicable agreements" renders the notice received by NATelCo's PPT customers inadequate to satisfy FCC regulations or the FCC Order of April 11, 2001.

48. Whether a *pro forma* notice to "call me" if there were any questions about a bill would apply to a threat to disconnect service based on a former court judgment.

49. Whether attaching its August 15, 2001 complaint to its Proof of Claim constituted adequate pleading in the Bankruptcy Court of the unliquidated amounts sought therein.

50. Whether the denial of summary judgment on the lost profits claim consti-tuted the law of the case justifying the confirmation of the Debtor's plan without liquidating

any claim for lost profits.

51. Whether MetTel was entitled to sue for lost profits, notwithstanding all the Debtor's other defenses to MetTel's Proof of Claim, in view of the fact that NATelCo admittedly would have defaulted in its performance of the NATelCo Agreement on May 1, 2001, and MetTel did not obtain permission from the PSC to migrate the Debtor's payphone lines to it until May 23, 2001.

52. Whether the four elements cited under "A. Liability" constitute the absolute limit of what a party claiming breach of contract must prove.

53. Whether the Bankruptcy Court considered or should have considered or wrongly evaluated whether MetTel observed the covenant of good faith and fair dealing inherent in every contract.

54. Whether MetTel hindered the Debtor's performance of the NATelCo Agreement by arbitrary action such as to excuse the Debtor's obligation to continue its performance under that contract.

55. Whether MetTel, intentionally or not, frustrated the performance of the condition precedent in the NATelCo Agreement requiring ten days' notice and opportunity to cure

56. Whether MetTel sustained its burden of proof on its claim for lost profits.

57. Whether the Debtor unilaterally terminated the NATelCo Agreement in May, 2001, or whether MetTel unilaterally terminated the NATelCo Agreement earlier in May, 2001.

58. Whether MetTel suffered lost profits on which it could justifiably collect damages.

59. Whether MetTel's proof of the amount of its lost profits was adequate.

60. Whether the fact that MetTel could have demanded the payment of $82,122.93 was any relevance to the demand it actually made.

61. Whether the decision of the Bankruptcy Court gave proper weight and

significance to its finding of fact that MetTel insisted on the payment of the unrelated judgment debt.

62. Whether the "futility exception" to situations in which the breacher abandons performance applies in a case of the other party imposing an extracontractual demand.

63. Whether the cases cited on p. 11 of the Bankruptcy Court's opinion are apposite to the situation involving an extracontractual demand.

64. Whether the Debtor failed to provide notice to MetTel or opportunity to cure.

65. Whether notice to MetTel would have been futile in view of its attorney's representations that MetTel's extracontractual demand would not be made.

66. Whether it would have been practically or physically possible to continue service to the Debtor's PPTs after a disconnection.

67. Whether MetTel would have or would have been obligated to issue a new Notice of Disconnection after any demand by the Debtor to remove the extracontractual demand.

68. Whether there were only two reasons why the Debtor did not give MetTel notice and an opportunity to cure.

69. Whether such other reasons for not giving MetTel notice and an opportunity to cure included the disastrous effects of interruption of service and the invalidity of the extracontractual demand.

70. Whether the Bankruptcy Court considered the Debtor's obligations to its site contractors and its own customers in evaluating the steps taken by the Debtor to preserve their rights in the face of MetTel's immediate threat to discontinue all service.

71. Whether the Bankruptcy Court considered that the disastrous effects of interruption of service included being subject to fines of up to $2,500 per day per phone and potentially irreversible damage to the Debtor's payphone business.

72. Whether the Debtor's obligation to pay the March and April, 2001 bills had any bearing on its lack of notice to MetTel or an opportunity to cure.

73. Whether MetTel could have suspended service before its own 10-day cure period lapsed.

74. Whether it would have been economically justifiable not to assume that MetTel would have suspended service before its own 10-day cure period ran out.

75. Whether notice would have been futile if service had been disconnected before MetTel's 10-day cure period expired.

76. Whether the catastrophic business risk facing the Debtor is MetTel failed to cure promptly affects the conclusion of the Bankruptcy Court that notice would not have been futile.

77. Whether the word "then" on the bottom life of p. 12 of the Bankruptcy Court opinion was meant to be "than".

78. Whether the cases cited in p. 13 of the Bankruptcy Court decision are apposite to this case.

79. Whether MetTel's history, including without limitation, proceedings in the Debtor's bankruptcy case, justified the Debtor's conclusion that it had no intention of curing its extracontractual demand.

80. Whether New York's exception to the requirement to perform a condition precedent to termination, as defined by the Bankruptcy Court, applies to an instance of unilaterally imposing an extracontractual demand.

81. Whether notice to MetTel was futile "only" because the Debtor would still have to pay $82,000 from later invoices.

82. Whether the representation of MetTel's attorney caused the Debtor's attorney not to press its objection to the sale of NATelCo's PPT accounts to MetTel.

83. Whether the December 2000 suspension of service and the statements by MetTel's attorney should be considered to have equitably estopped MetTel.

84. Whether the December 2000 suspension of service and the statements by MetTel's attorney made the Debtor's migration after MetTel's disconnection notice justifiable.

85. Whether the suspension of MetTel's service to the Debtor in December, 2000, was intentional and illegal,

86. Whether the suspension of MetTel's service to the Debtor in December, 2000, was sufficiently intentional and illegal, taken because MetTel learned that the Debtor was planning to migrate to another carrier, and taken without regard to any delayed recourse that might be obtained through the PSC in the expectation of making false representations to the PSC as to justify presuming that such premature suspension after a legal non-payment notice would be repeated after the illegal non-payment notice of May 8, 2001.

87. Whether the MetTel disconnection notice of May 8, 2001, based on its alleged unpaid judgment on a previous contract constituted tortious interference with a business relationship under the NATelCo Agreement.

88. Whether the MetTel disconnection notice of May 8, 2001, based on service from NATelCo not previously billed and covered at least in part by a previous deposit, was a valid disconnection notice under the terms of the NATelCo Agreement incorporating pertinent PSC regulations.

89. Whether damages to the Debtor's business occasioned by the weeks of delay that occurred in attempting to get all of its payphones reconnected after the original discon-nection by MetTel and numerous subsequent disconnections because of orders previously placed with Verizon by MetTel were so serious that the Debtor was obligated to migrate its lines after receiving the illegal May 8 2001 disconnection notice as soon as possible in order to protect itself against further losses to its business of similar magnitude.

90. Whether the Bankruptcy Court considered, or should have considered, that it could take several weeks for all of a payphone operator's hundreds of lines to be migrated.

91. Whether the Bankruptcy Court considered, or should have considered, that if the Debtor had complied with the notice-to-cure provision of the NATelCo Agreement, all

of its service could have been suspended on Monday, May 21, but MetTel would have had until Wednesday, May 23, to "cure" its breach by removing its irrelevant judgment amount from the May 8 disconnection notice, rendering the Debtor without any business and in violation of City regulations regarding inoperable payphones for five days even if MetTel had followed all its obligations to the letter.

92. Whether the Bankruptcy Court properly considered the applicability and effect of 16 NYCRR § 600.3.

93. Whether there was any credible evidence that the Debtor relied (in part) on MetTel's attorney's statement in not giving notice and an opportunity to cure.

94. Whether the damages claimed by MetTel at trial, but not in its Proof of Claim, constitute general or special damages.

95. Whether the NATelCo Agreement contemplated recovery of future lost profits on any breach.

96. Whether the NATelCo Agreement contemplated recovery of lost profits after the carrier imposed an extracontractual demand.

97. Whether the NATelCo Agreement addressed the carrier's lost profits.

98. Whether it was plausible for the NATelCo Agreement to define liability for the Debtor's lost profits because a total loss of income is the immediate result of any interruption of service for whatever reason, whereas NATelCo would have suffered only loss of passive income.

99. Whether and to what extent the NATelCo Agreement should be considered to have ambiguous terms.

100. Whether and to what extent the Bankruptcy Court erroneously relieved MetTel of the burden of proving the accuracy of its interpretation of ambiguous terms of the NATelCo Agreement.

101. Whether the Bankruptcy Court erroneously interpreted the NATelCo Agreement in favor of the interpretation urged by MetTel in areas where the Court had

previously ruled that its terms were ambiguous and no new facts were introduced to resolve such ambiguities, and whether the Bankruptcy Court properly declined to follow the principle that an ambiguous contract terms should be interpreted against the interests of the drafter.

102. Whether and to what extent the NATelCo Agreement should be construed against its drafter, NATelCo.

103. Whether and to what extent the details of the NATelCo Agreement were negotiable under conditions that were different from those obtaining in 1998.

104. Whether the Debtor would have been obligated to continue to pay fees under the NATelCo Agreement if the City fulfilled its threat to remove all of the Debtor's payphones.

105. Whether the presence or absence of any evidence that the parties contemplated the unilateral termination of the NATelCo Agreement by the Debtor is relevant to the question of whether it was unilaterally terminated by MetTel and the effect thereof.

106. Whether the ruling of the N.Y. Court of Appeals in *Goodstein Constr. Corp. v. City of New York*, 96 N.Y.2d 366 (1992) denying recovery of lost profits for an agreement that was not reached is relevant to denying recovery of lost profits to MetTel on a contract that was formerly in effect but no longer existed.

107. Whether both present parties signed the NATelCo Agreement.

108. Whether it is inconceivable, irrational or illogical for the parties to the NATelCo Agreement to have contemplated that the Debtor assumed the risk of MetTel's lost profits and whether such conclusion has any bearing on whatever evidence existed to show the original parties' actual intent.

109. Whether the fact that the City was threatening to remove all of the Debtor's payphones should have any bearing on the contemplations of the original parties to the NATelCo Agreement.

110. Whether the principle of *Trademark Research Corp.* is applicable to the case at bar.

111. Whether ¶ 5 of the NATelCo Agreement is applicable to the present controversy.

112. Whether NATelCo had the option to terminate the contract and whether any such right is relevant to the present controversy.

113. Whether the Debtor or MetTel terminated the contract.

114. Whether the Notice of Disconnection threatened termination of the contract.

115. Whether any reestablishment of service following cancellation by MetTel would be controlled by the terms of the NATelCo Agreement.

116. Whether ¶ 10 of the NATelCo Agreement justified a termination of the contract by the Debtor.

117. Whether the tariff of MetTel supplanted the tariff of NATelCo as a part of the NATelCo Agreement after the assignment of NATelCo's PPTs accounts to MetTel by the APA.

118. Whether § 3.2.2 of the NATelCo tariff applied to the controversy at bar.

119. Whether § 2.1.2(d) of the MetTel tariff is enforceable under PSC regulations.

120. Whether § 2.1.2(d) of the MetTel tariff applied to the controversy at bar.

121. Whether the assignment of the NATelCo Agreement substituted the MetTel tariff for the NATelCo tariff without a formal assumption of the MetTel tariff approved by the PSC.

122. Whether or not the assumption of the NATelCo Agreement by MetTel incorporated the MetTel tariff automatically by operation of law or by the power vested in the debtor-in-possession by the Bankruptcy Code.

123. Whether the incorporation of the MetTel tariff into the NATelCo Agreement after its assignment, taking into consideration the differences between the NATelCo tariff and the MetTel tariff, materially affected the terms for services rendered under the

NATelCo Agreement.

124. Whether the anti-slamming regulations of the FCC constitute non-bankruptcy law allowing the Debtor herein to reject the assignment of the NATelCo Agreement.

125. Whether the anti-slamming regulations of the FCC allow the Debtor to withhold consent to the assignment of the NATelCo Agreement and thereby cancel the transference of its liability to MetTel.

126. Whether MetTel failed to follow the procedures prescribed in the FCC Order granting a limited waiver of its anti-slamming rules.

127. Whether MetTel's failure to follow the procedures prescribed in the FCC Order granting a limited waiver of its anti-slamming rules allowed the Debtor to terminate or rescind the NATelCo Agreement.

128. Whether 47 U.S.C. § 258(a) implies a customer consent requirement before a carrier contract is assigned.

129. Whether 47 U.S.C. § 258(a) mandates a customer consent requirement before a carrier contract is assigned.

130. Whether the Debtor's authorization for the change in carrier pursuant to 47 C.F.R. § 64.1120 was obtained before the assignment of the NATelCo Agreement to MetTel.

131. Whether non-bankruptcy law gives telephone subscribers the absolute right to change carriers at any time.

132. Whether non-bankruptcy law gives telephone subscribers the absolute right to change carriers at any time, subject only to contractual monetary penalties enforceable under non-bankruptcy law.

133. Whether the Debtor's right under 47 U.S.C. § 258 to refuse to have MetTel as its carrier was extinguished by the FCC waiver Order.

134. Whether the Bankruptcy Court can interpret the Order of the FCC in MetTel's Petition.

135. Whether the Bankruptcy Court correctly interpreted the Order of the FCC in MetTel's Petition.

136. Whether the Debtor should be required to pay MetTel for service within 30 days of the unauthorized change in its service to MetTel.

137. Whether a notice letter stating that the customer has the option of choosing another carrier "subject to the terms and conditions of its plan" has the same effect as a notice letter stating that the customer is free to choose its own carrier subject to the terms and conditions of "any applicable service agreements".

138. Whether 47 C.F.R. § 64.1140(b) would require the Debtor to pay MetTel for any services or lost profits contemplated by MetTel more than 30 days after the unauthorized transfer of the Debtor's lines to MetTel regardless of whether the Debtor had in the meantime transferred its lines to another carrier.

139. Whether 47 C.F.R. § 64.1140(b) would require the Debtor to pay NATelCo for any services or lost profits contemplated by MetTel more than 30 days after the unauthorized transfer of the Debtor's lines to MetTel regardless of whether the Debtor had in the meantime transferred its lines to another carrier.

140. Whether any limitation on the assignment of the NATelCo Agreement without the Debtor's consent is superseded by the Sale Order, whether or not the actual migration occurred before the Sale Order became effective.

141. Whether any provision of the Bankruptcy Code that could be interpreted to impair the right of the Debtor to choose its won carrier would be in violation of the contracts clause of the U.S. Constitution.

142. Whether the right of any telephone customer to choose its own carrier enacted by the Telecom Act supersedes any right of a bankruptcy trustee to assign a debtor's contract without the contractee's consent which was enacted prior to the enactment of the Telecom Act.

143. Whether it was necessary for the Debtor to argue specifically, in its

objection to MetTel's Proof of Claim, that the NATelCo Agreement is within the exception to assignability of 11 U.S.C. § 365(c)(1).

144. Whether the changes in the obligations of the Debtor, as perceived by MetTel in interpreting its own tariff, constitute a change in the duty of the obligor such as to render 11 U.S.C. § 365(c) inapplicable to the NATelCo Agreement as modified by the Sale Order.

145. Whether the assignment of the NATelCo Agreement, to the extent not objected to by the Debtor, to an entity other than MetTel which would not affect the rights and obligations of the Debtor would be deemed within the scope of 11 U.S.C. § 365(c) and whether the legality such other hypothetical assignment should affect the determination of the legality of the purported assignment of the NATelCo Agreement to MetTel.

146. Whether the Sale Order overruled all unresolved objections to the assignment of the NATelCo Agreement to MetTel.

147. Whether the Sale Order should be enforced against the Debtor when it was entered before the notice to the Debtor required by Fed.R.Bankr.P. 6006.

148. Whether the Debtor can attack the validity of the notice of the Sale Order in the within contested matter.

149. Whether the effectiveness of the Sale Order was conditioned on regulatory approval as a matter of law regardless of any language within the Order.

150. Whether the direction in the Sale Order that all parties were to act in accordance with applicable nonbankruptcy law including all applicable tariffs included the obligation to seek regulatory approvals in accordance with the regulations of both the FCC and the PSC.

151. Whether there was any bench ruling in the NATelCo bankruptcy case from which the Debtor did or could have appealed.

152. Whether the practical conditions at the time of the Sale Order precluded obtaining regulatory approvals before the migration of the Debtor's lines to MetTel took

place.

153. Whether the Debtor received either notice from MetTel that purported to comply with the FCC Order.

154. Whether the Bankruptcy Court's finding that the Debtor received the second notification from MetTel was supported by the evidence.

155. Whether the content of either notification letter MetTel alleges it sent to the Debtor complied with the requirements of the FCC Waiver Order.

156. Whether receipt of only the second of the two notices from MetTel required by the FCC Order, and later the PSC Order, make legitimate the previous migration of the Debtor's lines to MetTel and obligated the Debtor to remain during the entire term of the NATelCo Agreement.

157. Whether any communication entitled "WELCOME LETTER" could constitute the notification required by the FCC and PSC Orders.

158. Whether a finding that a notification was received by the Debtor can be "infer[red]" from testimony and not stated as a finding based on the evidence.

159. Whether the Debtor's alleged receipt of the notification from MetTel is relevant to MetTel's claim for lost profits after the Debtor migrated to another carrier.

160. Whether failure to comply with FCC verification rules can affect the parties' substantive rights.

161. Whether FCC and PSC regulations and tariffs are deemed a part of any telecommunications contract, including the NATelCo Agreement.

162. Whether the Debtor had the right to change carriers without penalty, or the extent of any such penalty.

163. Whether the lack of notice of the right of the Debtor to change carriers is relevant, whether or not the Debtor exercised that right and whether or not the Debtor actually had that right under its contract, to the question of MetTel's right to sue for lost profits.

164. Whether the Debtor argued that MetTel waived its right to insist on

compliance with the NATelCo Agreement when it petitioned the FCC or the PSC.

165. Whether the FCC Order was concerned only with the timing of the notification of the Debtor and nothing more.

166. Whether the FCC Order, or the FCC apart from its Order in the petition for a limited waiver of its rules, had the power to enforce or enjoin any alteration of the previously-existing contractual agreements, including the NATelCo Agreement.

167. Whether Mr. Economou's testimony was that the limitation in the notification ("WELCOME") letter was intended to provide notice to customers who had signed service agreements that they would continue to be bound by those agreements, and whether the "WELCOME" letter actually provided such notice to a reasonable person reading the letter in its context.

168. Whether the notification language was intended to waive any contractual right or create a right to terminate a service agreement, and whether such notification language actually did or could be interpreted to waive previous contractual rights or create or reveal a right to terminate an extant service agreement, including the NATelCo Agreement.

169. Whether N.Y. Pub. Serv. L. § 99(2) affects service agreemnet such as the NATelCo Agreement.

170. Whether New York law and PSC regulations affect the question of the assignment or the need for the customer's consent to such assignments, including the NATelCo Agreement.

171. Whether New York law requires MetTel to obtain the approval of the PSC before becoming the carrier to payphone operators that had been customers of NATelCo.

172. Whether the Sale Order overrules any requirements affecting the assignability or termination of service agreements, including the NATelCo Agreement, contained in New York statutes or PSC Orders or Regulations.

173. Whether the PSC Order did not become effective before May 23, 2001, and whether testimony by the witness Economou to the contrary should not have been relied upon

and should have instead contributed to the non-credibility of Mr. Economou.

174. Whether actions taken by MetTel before the date of the non-retrospective PSC Order were improper and/or unauthorized thereby.

175. Whether the effect of the PSC waiver Order or the fact that it was not rendered *nunc pro tunc* affected the legitimacy of MetTel's actions whether or not the latter were sanctioned by the Bankruptcy Court or the FCC Order.

176. Whether any effectuation of the Sale Order depended on regulatory approval.

177. Whether any declaration in the Sale Order that customer contracts were in full force and effect is dispositive of any aspect of the dispute over MetTel's claim for lost profits.

178. Whether any declaration in the Sale Order that any future migration of customer phone lines will be legal and effective would ever be valid without regulatory approval which had not yet been obtained.

179. Whether the fact that penalties for violation of New York anti-slamming regulations are payable to the State rather than to the customer prevents the interposition of the defense of such violation against a claim by a non-compliant carrier for lost profits under a contract assigned in violation of those regulations.

180. Whether anti-slamming provisions in New York law can invalidate service agreements, including the NATelCo Agreement.

181. Whether the Bankruptcy Court considered, or should have considered, the numerous examples of bad faith on the part of MetTel in allowing it to enforce its interpreta-tion of the NATelCo Agreement; such example of bad faith included renouncing the represen-tation made by its attorney in the NATelCo bankruptcy case, setting the date of the threatened suspension of the Debtor's service five days before the date by which it would have to cure any breach of which it was notified, migrating the Debtor's phone lines to itself in violation of New York law and PSC regulations, violating the Order of Judge Bohanon entered May 16,

2001, by disregarding non-bankruptcy law, violating Judge Bohanon's Order by migrating the Debtor's lines before regulatory approvals had been obtained, sending its Notice of Disconnection before sending the May, 2001, bill (per testimony of its witness Economou), disregarding 16 NYCRR § 600.3 in suspending the Debtor's lines in December, 2000, before the earliest date allowed pursuant to that disconnection notice, and waiting at least one day before reversing said illegal suspension.

182. Whether the Debtor is liable for any lost profits to MetTel.

183. Whether the amount to be offset from the income that MetTel would have theoretically received from the remainder of the NATelCo Agreement is limited only to variable costs and should also include an attributable amount of fixed costs.

184. Whether it was proper to assume that the variable costs of MetTel in supplying service to the Debtor would be equivalent to such costs to NATelCo in supplying such service to the Debtor.

185. Whether the amount that MetTel claimed as its lost income was determined with sufficient certainty.

186. Whether it was proper to base the amount claimed by MetTel as lost income on a usage history that was not the most recent activity period and did not take into account trends in payphone usage throughout the affected geographical area.

187. Whether it was proper to base MetTel's estimate of the amount claimed as lost income on a usage history that was not the most recent activity period when it had records showing the more recent usage history with NATelCo but declined to introduce such records at trial.

188. Whether it was proper to base MetTel's estimate of the amount claimed as lost income on a usage history that occurred under a contract with different terms from those of the NATelCo Agreement.

189. Whether the refusal of the Bankruptcy Court in pre-trial motions to compel MetTel to produce documents sought by the Debtor affected the findings of fact and conclu-

sions of law made by the Bankruptcy Court after the trial on the basis of consequentially incomplete documentary evidence.

190. Whether it was error to fail to consider factors that could lead to diminished usage of payphones in the future including commercial lessees going out of business, new competition, increasing use of cell phones, greater penetration of residential phone service, vandalism, service outages, as recognized by other courts, *e.g.*, *In re Coin Phones, Inc. (Balaber-Strauss v. N.Y. Telephone Co.*, 203 B.R.184, 190 (Bankr. S.D.N.Y. 1996).

191. Whether the proper date for expiration of the NATelCo Agreement was January 31, 2002.

192. Whether Mr. Economou's testimony that MetTel lost $446,959.54 in gross income was credible.

193. Whether an established business criterion, used in *Merlite Indus., Inc. v. Valassis Inserts, Inc.*, 12 F.3d 373 (2nd Cir. 1993) is appropriate in the case of a new business in an emerging industry such as CLECs.

194. Whether the Debtor was entitled to a discount on some or all of the surcharges on MetTel's bills.

195. Whether witness Economou was competent to testify regarding the components of the Debtor's historical usage of unbundled network elements.

196. Whether all elements of the alleged lost income of MetTel were necessarily provided by MetTel under the assigned NATelCo Agreement.

197. Whether it was proper to assume that the entire list of the Debtor's payphones would remain the same throughout the hypothetical extended period of the NATelCo Agreement.

198. Whether it was correct to assume that MetTel would continue providing services through UNE-P in view of evidence of its intent to become a facilities-based provider, that NATelCo had been at least in part a facilities-based provider, and the APA contemplated UNE-P services only through the completion date and not for the entire duration

of the individual service agreements.

199. Whether it was error to credit one statement of witness Economou that NATelCo had provided service to the Debtor through UNE-P and ignore his other statement in his deposition that he had no idea.

200. Whether it was proper for the Bankruptcy Court to award damages for lost profits based on the assumption that NATelCo had been and would have continued to supply service to the Debtor via UNE-P absent evidence that all such service was supplied by NATelCo via UNE-P.

201. Whether it was proper to assume that items on the bills for a selection of phone lines chosen by MetTel as trial exhibits were for service by UNE-P when they were not identified as such and should have been so identified if that was the service that was being billed.

202. Whether it was proper to assume that items on the bills for a selection of phone lines chosen by MetTel as trial exhibits were for service by UNE-P when they were not identified as such and the NATelCo Agreement specifically permitted NATelCo to use alternately its own or others' facilities in providing service and NATelCo represented to the Debtor that it would provide service through its own facilities.

203. Whether it was proper to assume that items on the bills for a selection of phone lines chosen by MetTel as trial exhibits were for service by UNE-P when they were not identified as such and MetTel acknowledged that it had an invoice from Verizon showing how service was being supplied but did not attempt to introduce it as evidence, enabling a "missing witness" charge.

204. Whether it is proper to apply the principle of *expressio unius est exclusio alterius* to an invoice for which details of usage are required to be stated.

205. Whether it was proper to include the FCC line charge ("EUCL") at all in the amount of income allegedly lost to MetTel.

206. Whether it was proper to include the FCC line charge ("EUCL") at all in

the amount of income allegedly lost to MetTel absent evidence of statutory or regulatory authority therefor or a common practice in the industry approved by the regulatory agencies.

207. Whether it was proper to include the EUCL charge in MetTel's lost profits without proof that NATelCo would have been entitled to retain such charge, when applicable regulations indicate that it could not.

208. Whether it was proper to allow MetTel to increase the amount of its claim for lost income from $84,000 to $238,082.43 without any motion, much less a timely motion, to amend its Proof of Claim or objection to the Debtor's Plan of reorganization based on the non-inclusion of any reserve for MetTel's alleged lost profits.

209. Whether the Bankruptcy Court considered, or should have considered, that all the information utilized at trial to increase the amount of its demand for lost profits from $84,000 to $238,082.43 was available to it before it filed its first Proof of Claim in the Debtor's bankruptcy case.

210. Whether the Bankruptcy Court considered, or should have considered, that the information regarding the more recent usage period with NATelCo and would have aided in accurately estimating its alleged lost profits was available to MetTel before it filed its first Proof of Claim in the Debtor's bankruptcy case.

211. Whether MetTel was estopped from demanding any more than $84,000 in lost profits based on its historical experience by the statement subject to the penalties of perjury by its president fixing the amount of such claim at $84,000.

212. Whether MetTel should be estopped from demanding more than $84,000 in lost profits after the confirmation of the Debtor's 100% plan was dependent on that amount as the maximum claim.

213. Whether the statement of MetTel's president in its summary judgment motion itself constitutes an amendment of its proof of claim liquidating an amount that was admittedly unliquidated in its Proof of Claim and whether such *de facto* amendment precludes a later amendment, after the Debtor's reorganization Plan had been confirmed and effectuated,

trebling the amount sought.

214. Whether "Best" ever would have been able to file an "amended claim" for lost profits, as alleged in the Bankruptcy Court opinion, p. 38.

215. Whether MetTel had the burden of going forward with evidence of the amount of its lost-profit claim at the trial and did not assume that burden voluntarily.

216. Whether the Debtor relied on the Aronow estimate of MetTel's unliquidated Proof of Claim in accepting confirmation of its 100% Plan and not seeking further to amend it lest the amount sought by MetTel would eventually grow to three times its estimated size.

217. Whether the Bankruptcy Court considered, or should have considered, that the Debtor could have amended its reorganization Plan if it had known before confirmation that MetTel would seek three times the amount it estimated as the amount of its alleged lost profits.

218. Whether a later liquidation of a claim in an amount three times greater than the amount previously estimated constitutes grounds for reduction of the claim against a Debtor with an already-confirmed Plan.

219. Whether a debtor can testify about a decision that was made by himself alone without have such testimony discredited as being self-serving and not credible.

220. Whether the escrow provided in the Debtor's confirmed Plan should be accepted as a reasonable amount to cover the known unliquidated claims and any liquidation of those claims exceeding the maximum amount foreseeable at the time of confirmation should be deemed unreasonable.

221. Whether the Debtor would be predictably damaged if obligated to confirm a 100% Plan and not providing sufficient funds in escrow for the satisfaction of MetTel's Proof of Claim for which the unliquidated amount is liquidated at three times the expected amount five years after the confirmed Plan was declared effective.

222. Whether the Debtor consummated the sale of its operating assets without

Bankruptcy Court approval.

223. Whether it was proper to factor in the proceeds from the later sale of the Debtor's operating assets in determining whether the Debtor was solvent at the time of the confirmation of its Plan.

224. Whether it was proper for the Bankruptcy Court to infer from the NATelCo Agreement that the Debtor was obligated to use the lines of the carrier for the usage portion of the services it required as well as the access portion of those services.

225. Whether it was proper for the Bankruptcy Court to refuse to bifurcate the access and usage portion of the NATelCo Contract by analogy with other contracts containing specific exclusivity obligations.

226. Whether and to what extent the Bankruptcy Court interpreted the NATelCo Agreement as if it contained exclusivity clauses which were not present therein.

227. Whether it was proper for the Bankruptcy Court to infer that exclusivity with respect to one aspect of the NATelCo meant that exclusivity was intended to apply to all aspects of that contract.

228. Whether the decision in *AT&T Co. v. N. Amer. Indus.*, 772 F.Supp. 777 (S.D.N.Y. 1991) controls in the case at bar and requires a finding that the Debtor was not obligated to use MetTel for the usage portion of its payphone services.

229. Whether the decision in *Trademark Research Corp. v. Maxwell Online*, 995 F.2d 326, 334 (2nd Cir.1993) controls in the case at bar and requires that one party cannot recover for lost profits when the other party would not have accepted exposure to liability for such lost profits.

230. Whether the standard of damages fixing the amount as what it would take to place MetTel in the position it would have been in if there had been no alleged breach by the Debtor should include the amount that MetTel would have received as income from usage portion of the service to the Debtor's phones, when the Debtor was not obligated to obtain usage for its phones from MetTel and would have been motivated to avoid using MetTel for

its telecommunications services under any circumstances.

231. Whether the selection by the Debtor of another carrier for its usage charges, after NATelCo had already abandoned its obligations under the NATelCo Agreement by assigning the contract to MetTel, would constitute an impermissible removal of some or all of the Debtor's payphones from Schedule A of the contract.

232. Whether it would have been possible for the Debtor to reroute calls from its payphones to another carrier from a computer in its office, so that the Debtor would not be charged for usage by the first carrier.

233. Whether it would have been necessary, under the circumstances of the entry of the Sale Order without proper notice to the Debtor, for the Debtor to attempt to reroute calls to another carrier from a computer in its office in order to establish that it had the right and the ability to do so for purpose of liquidating the damages claimed by MetTel for lost profits under the NATelCo Agreemnet.

234. Whether the NATelCo Agreement required the Debtor to use NATelCo as the carrier to provide usage, as opposed to dialtone, services to its payphones.

235. Whether the Debtor understood the NATelCo Agreement to require it to use NATelCo to provide usage services whether or not it used NATelCo to provide usage services in the past or previously signed contracts that obligated it to use the contracting carrier for all telecommunications services.

236. Whether the NATelCo Agreement was a "requirements" contract that required the Debtor to use NATelCo for all of its telecommunications service requirements during the duration of the contract.

237. Whether the Bankruptcy Court is competent to evaluate the comparative credibility of the witnesses Chaite and Economou on the subject of whether calls could have been rerouted through a different carrier.

238. Whether the determination of the Bankruptcy Court that the testimony of Mr. Economou was more credible than the testimony of Mr. Chaite on the technical issue of

whether the Debtor could have rerouted its local calls through a different carrier when there was no evidence of any practical technical experience on the part of Mr. Economou as opposed to the years of technical experience in the field possessed by Mr. Chaite.

239. Whether the way the Debtor did business in the past is a preclusive indicator of the way it would do business under the circumstance where it was being compelled by the Bankruptcy Court to do business with an entity to which it had objected and which had tried every effort in the course of its bankruptcy case to drive the Debtor out of business and even to take over the Debtor's business for itself.

240. Whether the fact that the 1999 contract between the Debtor and MetTel required the Debtor to use MetTel exclusively and the NATelCo Agreement did not require the Debtor to use NATelCo exclusively affects the conclusion of the Bankruptcy Court that it made no "business sense" to use two different carriers simultaneously.

241. Whether it can be deemed to make "business sense" to use two different carriers simultaneously when one of the carriers is being imposed against the customer's will and is actively attempting to destroy the customer's business for its own commercial gain.

242. Whether it is proper to view the 1999 MetTel contract and the 2000 NATelCo Agreement against the same business practices when the latter, after assignment, became an adversary situation where MetTel was not engaging in the ideals of good faith and fair dealing deemed to be an element of any business contract.

243. Whether the Bankruptcy Court erred in denying the Debtor's prior motions for summary judgment dismissing MetTel's claim for lost profits.

Respectfully submitted,


Dated: New York, New York
        June 8, 2007                                    /s/ Mayne Miller
                                                        MAYNE MILLER (MM-4106)

-27-

21-55 45th Road, 2nd Floor
Long Island City, New York
Mail: P.O. Box 8050, G.P.O.
New York, NY 10116
(718) 472-1900
Attorney for Appellant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of

BEST PAYPHONES, INC.,

                         Debtor

Case No. 01-B-15472 (SMB)
            Chapter 11

BEST PAYPHONES, INC.,

                Debtor-Appellant,

       -against-

MANHATTAN TELECOMMUNICATIONS CORPORATION,
                Claimant-Appellee.

Docket No. 07-Cv-

DESIGNATION OF RECORD

## DESIGNATION OF RECORD ON APPEAL

       The Appellant designates the following documents as its Record on Appeal.

       1. The transcripts of the trial on December 4, December 13 and December 14, 2006.

       2. The Exhibits that were prepared by the Debtor for the trial, listed in Attachment 1 annexed hereto.

       3. The Exhibits that were prepared by the Claimant Manhattan Telecommunications Corporation ("MetTel"), listed on Attachment 2 annexed hereto.

       4. Documents previously filed in the Debtor's bankruptcy case, appearing as the items whose document numbers are circled an the Docket Sheet, annexed hereto as Attachment 3.

       A unified list of these documents will be submitted when all transcripts have been obtained.

Dated: New York, New York
      June 8, 2007

                              /s/ Mayne Miller
                              MAYNE MILLER (MM-4106)

All exhibits present at trial, but not necessarily "Admitted" or "Received." Please look at the attached document identification forms presented with either the Debtor's and Claimant's exhibits. The designated documents have an X in the "Identified" box, but not necessarily an X in the "Admitted" or "Received" box.

Transcripts - - Transcripts not identified on docket sheet:
9-4-02, 10-31-02, 12-24-02, 1-20-04, 3-1-05, 3-21-05, 6-27-06

Transcripts identified on the docket sheet:
3-27-02, 8-20-02, 9-12-02, 9-26-02, 10-10-02, 12-3-02, 2-11-03, 3-11-03, 4-16-03, 6-17-03, 3-25-04, 5-11-04, 11-1-06


Docket Sheet - -
All documents below and the exhibits thereto. The main documents are circled on the attached Docket Sheet and the Exhibits to the main documents are listed in the Docket Text section. The numbers of the documents are:

81, 82, 88, 104, 105, 110, 115, 113, 117, 119, 122, 124, 125, 126, 128, 129, 263, 138, 139, 140, 145, 147, 148, 149, 150, 155, 156, 158, 159, 160, 162, 163, 166, 167, 175, 204, 219, 220, 221, 224, 274, 278, 279, 286, 299, 298, 300, 302, 303, 312, 315, 317, 320, 341, 342, 371, 372, 388, 419, 420, 476, 483, 484, 485, 488, 493, 500, 502, 505, 511, 516, 517, 529, 540, 541, 548, 551, 560, 561, 594, 621, 616, 630, 631, 632, 627, 638, 639, 641, 643, 649, 650, 651, and 653

21-55 45th Road, 2nd Floor
Long Island City, New York
Mail: P.O. Box 8050, G.P.O.
New York, NY 10116
(718) 472-1900
Attorney for Appellant